UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF | NUMBER |
| **MICHELLE GUTHRIE-BROWN** | **05-19585** |
| | **SECTION A** |
| DEBTOR | |
| | CHAPTER 7 |
| **WILLIAM H. CAMBRE, JR.** | ADVERSARY NUMBER |
| PLAINTIFF | **06-1029** |
| V. | |
| **MICHELLE GUTHRIE-BROWN** | |
| DEFENDANT | |

*CONSOLIDATED WITH*

| | |
|---|---|
| IN THE MATTER OF | NUMBER |
| **ROBIN GUTHRIE-BROWN** | **05-19574** |
| | **SECTION B** |
| DEBTOR | |
| | CHAPTER 7 |
| **WILLIAM H. CAMBRE, JR.** | ADVERSARY NUMBER |
| PLAINTIFF | **06-1030** |
| VERSUS | |
| **ROBIN GUTHRIE-BROWN** | |
| DEFENDANT | |

## MEMORANDUM OPINION

This matter came before the Court on the consolidated trial of the above-captioned adversary proceedings.[1]  Upon conclusion of the trial, the Court took the matter under advisement.

---

[1] This Opinion is not intended for publication.

**I. Findings of Fact**

The defendants are Robin Guthrie-Brown and Michelle Guthrie Brown ("Defendants"). Defendants are members of several limited liability companies formed for the purpose of constructing residential and commercial buildings. Robin Guthrie-Brown is a licensed contractor.

Defendants formed Sugarland Estates, L.L.C. ("Sugarland") in order to purchase a 110 acre tract of land in Wallace, Louisiana ("Wallace tract") and to develop a residential subdivision on that land called Sugarland Estates ("Subdivision"). Prior to embarking on this venture, Defendants conducted market research which indicated a strong need for residential housing for middle to low income families.[2] Defendants concluded that such a development would be profitable if it featured single family homes at a cost of no more than $100,000.

On July 10, 2002, Ray Brown, father of defendant Robin Guthrie-Brown, entered into a Purchase Agreement for the Wallace tract.[3] The Purchase Agreement was predicated on St. John the Baptist Parish approving the development of the Subdivision. The sale price was $450,000.

To cover the costs of development, as well as purchase the Wallace tract, Defendants and Sugarland sought financing from several banks, including Whitney National Bank, Bank of St Charles, and Hibernia National Bank. Defendants created a prospectus for this purpose entitled "Sugarland Estates Development Luxury Neighborhood Living" ("the Prospectus").[4] The Prospectus contains a breakdown of the estimated costs of development and profits, a description

---

[2] Joint Exhibits Da and Db.

[3] Though the Purchase Agreement was in the name of Ray Brown, the Defendants established that Mr. Brown held the contract for the benefit of Sugarland.

[4] Joint Exhibit J.

2

of the four construction phases, model house plans, a letter from the St. John the Baptist Parish President and several newspaper articles extolling the benefits of the Subdivision.

Prior to 2003, Defendants obtained a commitment, from Hibernia National Bank ("HNB"), for financing the purchase of the Wallace tract and construction of Phase 1 of the Subdivision. However, the commitment came with a long list of arduous funding prerequisites.[5] Among the requirements imposed by HNB were approval of the development from the necessary governmental agencies, topography surveys and engineering plans, and the pre-sale of at least one-third of the lots (twenty) in Phase 1.

In order to meet HNB's funding requirements, Sugarland utilized the services of Richard Guthrie, a licensed architect and the father of Michelle Guthrie-Brown. He supplied architectural drawings for the Subdivision's model house plans. Sugarland hired civil engineers to design the specifics of the Subdivision's infrastructure. Topography, survey, and soil reports were obtained. Costs for the installation of lift stations for water supply were investigated and designed. Sugarland also approached Tina Lowe ("Lowe"), a licensed realtor who had worked for Defendants in the past, about pre-selling the lots.

All of the costs of development were initially funded by Defendants. In late 2002, the Subdivision had received approval for development from the St. John the Baptist Parish Council, its Planning and Zoning Board, and Water, Sewer and Drainage Board.[6] However, Defendants had

---

[5] Defendants testified that they attempted to obtain financing from other lenders in the hope that the requirements specified by HNB could be avoided, but to no avail.

[6] Joint Exhibit J, 10/02/02 letter from St. John the Baptist Parish establishes that Sugarland Estates received approval form the Water, Sewer and Drainage Board and preliminary approval from the Planning and Zoning Commission of St. John the Baptist Parish. Robin Guthrie-Brown testified that Sugarland Estates received final approval from the Parish Council.

not yet pre-sold the required twenty lots in order to close the financing package with HNB. Expenses were mounting and the Defendants lacked sufficient cash to complete the pre-financing requirements of HNB.

In late 2002, Lowe was approached by the Plaintiff ("Cambre") regarding potential investments in real estate. Cambre, a personal friend of Lowe's, asked her to keep an eye open for him should any opportunities arise. Ultimately, Lowe put Cambre in contact with Defendants as a potential investor in their project.

There is disagreement between the parties as to when and how many times Cambre and Defendants met, but the Court is convinced that Cambre received a copy of the Prospectus and had a least one meeting with Defendants to discuss the project. An agreement was struck between the parties and memorialized on February 10, 2003. Cambre loaned $100,000 to Defendants, Guarantee Construction, LLC and Sugarland. In exchange he received a promissory note[7] ("Note"). The Note provided for repayment of the debt in four annual installments: $25,000 on June 1, 2004, $25,000 on June 1, 2005, $25,000 on June 1, 2006, and $125,000 on June 1, 2007. Under the Note, if an event of default continued for more than ten days after written notice, the entire balance would become due and payable. The Note was prepared by Lowe.

The Note does not specify the purpose, or limit the use, of Cambre's investment.

Also on February 10, 2003, Cambre, Defendants, Sugarland, Guarantee Construction, LLC, and Lowe entered into a "Business Agreement"[8] prepared by Lowe. The Business Agreement

---

[7] Joint Exhibit A.

[8] Joint Exhibit B.

provides that Cambre's $100,000 "investment" is guaranteed by the Note and a mechanic's lien[9] on a 110 acre tract of land in Wallace, Louisiana. It does not specify any particular use for the $100,000 loaned by Cambre, it simply notates the amount advanced as a, "CASH investment."

The Business Agreement acknowledges that Cambre's lien is to be recorded upon the purchase of the 110 acre tract. It also provides that as long as the Note is current and not in default, Cambre will execute a partial release of his mechanic's lien as each house or lot in the Subdivision is sold.

The Business Agreement contains provisions pertaining to Lowe. Under its terms, Lowe was to receive a 3% commission on the sale of each house or lot in the Subdivision, "a negotiable weekly salary" as an employee of Sugarland and/or Guarantee Construction, LLC for handling sales, and 1% of the net profit obtained from the development of the Subdivision, payable annually beginning June 1, 2004.

Cambre and Lowe acknowledged that at the time the money was lent, the Note signed, and the Business Agreement executed, they were both aware that the Wallace tract was merely under contract for purchase. Cambre also believed that Defendants' loan commitment, when coupled with his $100,000, would be sufficient to allow Defendants to purchase of the Wallace tract.

Initially, Defendants used at least $220,000 of personal funds to cover the costs of the Subdivision project. They testified that $60,000 was spent for topography reports, $20,000 for surveys, $15,000 for soil boring samples, and $10,000 to extend the term of the Purchase Agreement on the Wallace tract.[10]

---

[9] Ms. Lowe is not an attorney and evidently no one involved sought the advice of legal counsel. The Court notes that a state law mechanic's lien can not attach to real property.

[10] In February of 2003, the seller required an additional fee of $10,000 to extend the period to close on a sale.

Defendants used the $100,000 loaned by Cambre to reimburse themselves $60,000 for costs of development previously satisfied from their personal funds and $10,000 to reimburse Guarantee Construction, LLC for the extension of the Purchase Agreement's term. The remaining $30,000 was used for on-site supervisors, transportation, and additional costs all associated with the development. Neither Defendants, their relatives, nor their companies, received any compensation from Sugarland or the funds invested by Cambre.

Defendants were unable to purchase the Wallace tract because after October 2004, the seller would not grant additional extensions of time to close. Because Defendants had not met all of HNB's prerequisites for funding, the money to purchase the Wallace tract was unavailable.[11] As a result, the development of the Subdivision was terminated.[12]

In 2004, Defendants made the first installment payment of $25,000 to Cambre in five separate payments of $5,000, but Defendants defaulted on the subsequent payments required by the Note.

On August 4, 2005, Cambre filed suit in Plaquemines Parish against Defendants, Guarantee Construction, LLC and Sugarland to collect the amount due under the Note.[13]

Defendants filed petitions for relief under Chapter 7 of the Bankruptcy Code on October 13, 2005.[14] The Plaquemines Parish suit was stayed as a result. On February 8, 2006, Cambre instituted

---

[11] Ultimately all but 7-8 lots fo the 20 needed were pre-sold.

[12] The Wallace tract was ultimately purchased by Sugar Lane Estates, LLC for $450,000. Defendants have no connections with Sugar Lane Estates, LLC.

[13] Case no. 52-760, 25th JDC, Parish of Plaquemines, State of Louisiana.

[14] Michelle Guthrie-Brown: 05-19585, Section A; Robin Guthrie-Brown: 05-19574, Section B.

6

two separate adversary proceedings, one against each Defendant, in their bankruptcy cases. The adversaries were consolidated for trial.

## II. Conclusions of Law

Cambre alleges that the $175,000 owed to him by Defendants under the Note, as well as all attorney's fees and costs, are non-dischargeable under 11 U.S.C. §523(a)(2)(A). Section 523(a)(2)(A) provides:

> a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-- …
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

The Fifth Circuit has articulated four elements which Plaintiff must prove by a preponderance of evidence:

> (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance. *Id.*
>
> Debts that satisfy the third element, the scienter requirement, are debts obtained by frauds involving "moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made." *In re Martin,* 963 F.2d 809, 813 (5th Cir.1992). An intent to deceive may be inferred from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *In re Norris,* 70 F.3d 27, 30 n. 12 (5th Cir.1995), citing *In re Miller,* 39 F.3d 301, 305 (11th Cir.1994). [15]

---

[15] *Gen. Electric Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005).

7

### III. Allegations of Fraud

Cambre alleges that Defendants obtained the Note by "false pretenses, a false representation, or actual fraud." Specifically, Cambre alleges that Defendants represented to him that the $100,000 he loaned them would be used solely for the purchase of the Wallace tract and that each Defendant had a $175,000 line of credit which could be utilized to purchase the land. Cambre avers that but for these representations, he would not have lent the money to Sugarland. Because Defendants allegedly disregarded the conditions of funding by spending the money on other corporate expenses and misrepresented the funding they had available for the project, Cambre alleges a fraud has been practiced upon him.

### A. Use of Funds

Cambre believes that he was defrauded by Defendants because they failed to repay him his investment and failed to utilize the funds they received for the purchase of the Wallace tract. Cambre believed that the $100,000 he loaned Defendants was solely for the purchase of the Wallace tract. However, neither the Note nor the Business Agreement condition the use of funds.

Defendants testified that they believed the loan was an investment in the project itself. It was their understanding that the funds could be used for any purpose and were not earmarked for the purchase of the Wallace tract. The Court believes that there was a misunderstanding between the parties, but the misunderstanding does not rise to the level of fraud.

It is clear to the Court that Defendants were committed to the Subdivision and worked diligently to both develop the project and obtain financing to purchase and develop the Wallace tract. It is also evident that they expended a tremendous amount of time and effort and significant personal funds to this end. The Court also concludes that they did not use any of the funds available

8

and belonging to Sugarland for any illegal or unauthorized purpose, nor did they, their relatives or their other companies personally benefit from any corporate funds.[16]

Cambre was an unsophisticated investor. He was an electrical contractor by training, though at the time of this transaction, he was retired. It is evident to the Court that Cambre did not properly understand the nature of his investment or its risks, though that lack of understanding was not through any fault of Defendants. The source of the disagreement over the use of funds can be traced to Lowe. Lowe, a person of limited knowledge but significant confidence, was a personal friend of Cambre and someone in whom he placed great trust. Cambre testified that he looked to Lowe to advise him as to the acceptability of the project and to protect his interests. As it turns out, that reliance was misplaced.

Lowe was a local real estate agent of limited experience, having received her realtor's license a mere four years prior to this transaction. It is evident to the Court that she was beyond her abilities in both advising Cambre and in creating and explaining the legal documents executed by him. Loose language and imprecise explanations between Cambre and Defendants resulted in an honest lack of understanding both as to the nature and terms of the investment, as well as the risks associated with its repayment. Without a qualified professional to assist the parties, the table was set for misunderstanding and unrealistic expectations. When the project failed, cries of foul were bound to be heard.

Cambre testified that he "told the ladies" that they had to use his money to purchase the property. He also stated that he "understood" his money would be escrowed pending sale. The Court is not convinced that Cambre legally conditioned the use of his advances as he now claims.

---

[16] Cambre offered no proof whatsoever of any malfeasance or conversion of funds.

At trial, Cambre was asked why he believed he was defrauded. His immediate reason was because he had not been repaid. He had to be prompted by counsel to enumerate the alleged fraudulent representations of Defendants. Even then his language was peppered with phrases, "I assumed...," "it was my understanding...," and "I thought...." Very little about Cambre's testimony was direct and unequivocal.

Lowe's testimony was equally suspect. Lowe testified that she would not have recommended the project to Cambre had she not believed his funds would be escrowed pending sale.[17] However, nothing in the Business Agreement or Note she drafted make reference to this alleged critical term.[18] Lowe was aware that the project needed an investor. She had been told by the Defendants that funds were needed to complete the acquisition and bank financing. The Court finds the testimony of the Defendants credible on this point. Lowe specifically introduced Cambre to Defendants because they needed funding and he was looking for a real estate investment. Defendants prepared the Prospectus, delivered it to Cambre and discussed the project in detail with him all in the presence of Lowe.

The return on Cambre's investment is also indicative of its nature. The Note provides for a $100,000 profit, double the original investment. In the Court's experience, few real estate loans

---

[17] If the Court were to take Lowe at her word, it makes no sense that the funds would not have been deposited into an interest bearing account while waiting for closure on the HNB loan. Typically, escrowed funds are held in trust or invested in low interest/ low risk securities pending their use. Cambre's advance occurred almost two years prior to the ultimate loss of the property. However, neither Cambre nor Lowe requested investment of the funds pending the purchase.

[18] As for Lowe's understanding, her lack of attention to detail may have come from her own self interest. Under the terms of the Business Agreement between Defendants and Cambre, she included several material provisions giving herself not only compensation for selling lots, but a salary from Sugarland and a share of the profits. None of these terms had anything to do with the deal between Defendants, Sugarland and Cambre, but they were included none the less. Cambre testified that he knew Lowe stood to benefit from the development and agreed to invest, in part, to help her out.

carry such a large return.  Return is indicative of risk.  An investment in a real estate project is inherently more risky than one in real estate.  The Note reflects this risk.

There was disagreement in the testimony as to how the rate of return was negotiated. Cambre and Lowe testified that the Defendants offered the amount, Defendants testified that Lowe determined the amount.  Either way, the rate was agreed upon by the parties and is evidence of each side's evaluation of the risk.

The problem between the parties comes from an honest mistake as to what an "investment in real estate" entails. The Court believes that Cambre thought he was buying property, rather than investing in a real estate project.  The Court also finds that Defendants believed Cambre understood that he was investing in the development project, not a specific asset.  The misunderstanding is unfortunate, but not fraudulent.  Had Lowe been more astute, or had professional advice been requested, this misunderstanding could have been discovered and avoided.  Nevertheless, without specific provisions in the Business Agreement, Cambre failed to restrict the use of funds and Sugarland was free to use them for  business purposes.

In conclusion, the Court believes that the alleged "condition" of Cambre's funding was not communicated to Defendants at the time of the loan, not required by the loan documents, and not enforceable against them.  In reality, if this condition existed at all, the Court finds it was merely an assumption on the part of Cambre, not a representation by the Defendants that supports a claim for fraud.

### B. Alleged False Representations as To Credit Access

Cambre alleges that Defendants defrauded him because they represented access to $350,000 in personal lines of credit. Defendants vehemently denied that they represented to anyone that they had personal lines of credit for $175,000 each.

The Court finds the Defendants' testimony credible. In early 2003, Defendants held a bank commitment from HNB for the purchase and development of the Subdivision. It is also clear that Cambre's $100,000 was necessary to secure its funding.

The Prospectus estimates the costs of Phase 1 to be $945,000. The HNB loan was for sixty (60%) percent of Phase 1's costs or $567,000. This included the costs to acquire the land, engineering and lot construction. HNB required the pre-sale of 20 of the 60 lots in Phase 1 prior to funding. The cost to construct lot sites was projected to be $6,666 each or $133,320 for 20 lots[19] reducing the total initial cost of Phase 1 by $267,000. Therefore, the HNB loan and Cambre's $100,000 would have been sufficient to fund the purchase of the land and the initial development of 20 pre-sold lots. After this initial cost, profits from the pre-sold lot sales would have easily funded the completion of the remaining 40 lots in the Phase.[20] Profits from the next forty lots would have satisfied a large portion of the HNB debt, paid Cambre, and provided substantial profits to Sugarland.[21]

---

[19] The total construction budget was $400,000 for sixty lots or $6,666 per lot.

[20] HNB's funding predicate requiring the pre-sale of twenty lots is logical based on the economics contained in the Prospectus. The first 20 lots would have netted $388,000 after realtor's commissions, enough to finish developing the next forty lots ($167,000) and provide a $221,000 cushion.

[21] The sale of the last forty lots in Phase 1 was projected to net $796,000 after realtor's commissions. With all costs of acquisition and development covered through the HNB loan, Cambre, and the pre-sale of the first 20 lots, the sale of these lots would generate pure profit. The projected profits available from the sale of lots does not include additional, potential, profits from the construction of homes on the sites sold.

The catch to Sugarland's plans was that substantial funds had to be advanced by Sugarland to obtain government approvals, meet HNB's funding requirements, develop plans and specifications for infrastructure, water and sewerage placement, and utilities. While these costs were included in the Prospectus and HNB's commitment, they had to be prepaid before the funding of the loan could close. This is because HNB's funding requirements necessitated the delivery of surveys, topography reports, engineering plans, and government approvals.

Defendants testified that they personally invested over $160,000 in funds into the project.[22] Coupled with Cambre's funds and HNB's commitment, the project was adequately funded. In fact the project failed not because of lack of funding, but lack of time. Had Defendants been able to secure another extension of time to close their sale on the Wallace tract, the remaining lots could have been sold, HNB would have closed on its loan, and the project would have been underway.

The Court does not find that Defendants misrepresented the facts of their project, access to credit, or amounts needed to complete the sale and development. Cambre complains that Defendants misrepresented access to credit facilities or a loan commitment for the purchase of the land. In fact, Defendants did have a commitment for the land's purchase. Again, the problem was not what Defendants represented, but what Cambre understood it to mean.

Cambre simplistically believed that a loan commitment was the equivalent of guaranteed funding. He did not understand that all loans, especially commercial ones, require conditions be met prior to funding. Lowe clearly understood this difference because she was involved in pre-selling the lots, obtaining Cambre's investment when Defendant's needed funds, and even offeing Cambre as a guarantor on the loan when it appeared in doubt. If she explained this to Cambre is unclear, but

---

[22] This was net of the funds repaid from Cambre's investment.

Defendants had every right to expect she had.[23] For their parts none of the documents Defendants gave to Cambre, nothing they said, or omitted indicates an attempt to hide a critical fact. The Prospectus is clear, the details of the funding fairly simple to ascertain and the requirements of HNB's loan commitment would have been readily discoverable had Cambre asked. Instead to many unwarranted and unrealistic assumptions were made by Cambre. The failure of Cambre to investigate the investment does not constitute fraud on Defendants' part.

The Court does not believe that Defendants represented access to two $175,000 personal lines of credit. The representations with regard to the HNB loan, coupled with the economics provided by the Prospectus, establish that the $100,000 provided by Cambre was all that was necessary to fund Phase 1 of the project. The representations of Defendants were accurate and not misleading.

**IV. Conclusion**

Plaintiff invested $100,000 in the Sugarland Estates project. Defendants invested their personal funds in the project and worked diligently in furtherance of its completion, but unfortunately the project failed. Plaintiff has failed to meet his burden of proof under 11 U.S.C. §523(a)(2)(A) that Defendants made false representations to Plaintiff or committed actual fraud. Therefore, the debt owed by Defendants to Plaintiff is dischargeable.

---

[23] This conclusion would have continued since throughout the twenty-two months following Cambre's advance, no one requested that the funds be returned, nor did they pressure Defendants to close. Neither Cambre nor Lowe requested the investment of the funds in an interest bearing account. Although Cambre testified that he "assumed" the property would be purchased within days of his advance, he was quickly aware that Defendants were having difficulty closing the loan. Either Defendants or Lowe contacted Cambre throughout this period to advise him of the problems Sugarland was having with HNB's loan funding pre-requisites.

A judgment will be entered in favor of Defendants, Michelle Guthrie-Brown and Robin Guthrie-Brown and against William H. Cambre.

New Orleans, Louisiana, October 27, 2006.

                              Hon. Elizabeth W. Magner
                              U.S. Bankruptcy Judge